Good morning, everyone. Welcome to the Ninth Circuit. The first case on the calendar is United States v. Tolth. For everyone in the audience, we will be taking a short break after the Tolth case and then proceed to the remainder of the calendar. Judge Berzon and I would like to thank very much Judge Lefkoe from Illinois, who is sitting with us, and we very much appreciate her doing so. And Judge Lefkoe is going to be participating by video. Good morning, Judge Lefkoe. Can you hear us okay? I can hear you. Can you hear me? And good morning. Yes, we can. Everything is all set. So we'll proceed. We don't have any closer video? That's all we've got? We don't have a video that's anywhere near us? Thank you. All right. So, counsel, you have ten minutes aside and whenever you are ready. Good morning, Your Honors. May it please the Court, my name is Tracy Van Buskirk and I represent the appellant in this case, the United States of America. I would like to reserve two minutes of my time for rebuttal. Your Honors, in this case, the Mosley, the Michigan v. Mosley factors strongly favor a finding that the defendant's rights were scrupulously honored. Here, the district court failed to give proper weight to the most important Mosley factor, which is the provision of fresh Miranda warnings. And in this case, they were given before each subsequent interview that took place after the defendant's invocation. When the agent contacted the defendant for a second interview, he not only read the Miranda warnings, but both before and after those warnings, he spoke to the defendant in a very understandable way and made clear that a conversation would happen only if it was completely voluntary and up to the defendant. But what do you think he lied to the defendant before the waiver was obtained, the written waiver?  And does that matter? Suppose he did. Suppose he did. I think it does matter because the court has to consider the totality of circumstances. I know, but that's not very helpful. So does that factor matter? I do think it does. He said that they – he suggested that they had lied before he got the waiver, but it doesn't seem that he did, or did he? Your Honor, the government's position is that he did not lie before the waiver. His lie took place after the defendant had verbally acknowledged his rights, signed the waiver, and then when he said he'll listen, then the agent provided him with something that was untrue, which was that they had found the victim's truck. But he also signed the waiver. Yes, Your Honor. Right. So he agreed to speak at least until he stopped him at that point. That's correct, Your Honor. He signed the waiver that acknowledges that he understood his rights and that he was willing to proceed with questioning without an attorney present. And he did that with both subsequent interviews. He did it on the first interview, too. Counsel, this may not really be germane to the legal issues before us, but is there any update on Mrs. Begay? Was – has her body ever been found, or has she ever showed up? Your Honor, neither Mrs. Begay's truck nor her body have been found. All right. Thank you. You're welcome. Your Honors, the district court did not place much weight on these fresh warnings, and instead, as the court has already touched on, the district court really relied on lies that were told by the agent during the interview. But in Mosley, the lies that were told by the police were far more incriminating than the lies that were told to the defendant in this case. In Mosley, the lie that was told to the defendant was that someone had implicated him, someone had confessed, and that someone had said that he was the shooter in a robbery murder. Here – and even in light of that lie, the Supreme Court found that the defendant's rights had been scrupulously honored. Here, by contrast, the agent's lie did not tie evidence directly to the defendant. The agent said things like, the truck was found, we're doing testing in forensics, there was some blood. But at no time did the agent say something to the effect of, and your DNA was found in that truck, or link the evidence directly to the defendant, as was done in Michigan v. Mosley. Also, the six days in between the interviews should have been viewed favorably by the district court. It shows that the agents respected the defendant's right to cut off questioning. They did not badger him. They did not go back and try to wear down his resistance with repeated attempts or repeated approaches over a short period of time. There was the solid six days in between the invocation and when agent – and when the agent reapproached for the second interview. The Court's questions at the evidentiary hearing seem to suggest that the Court may have viewed that time in custody in a different way, may have viewed it disfavorably instead of favorably, representing that the agents actually allowed the defendant time to cut off questioning and consider whether he would engage in another interview. The courts have made clear more time is better for the government in looking at the Michigan v. Mosley factors. I think that's correct, Your Honor. The courts have been mainly concerned with short turnarounds, when agents have either repeatedly gone back or just waited a short period of time before reapproaching the defendant. There's very little case law talking about a number of days like what we have here. And I do think that in Mosley, this should be weighed as a favorable factor because the concern was the shortness of the reapproach. The district judge seemed to call it a pretext or a setup to get him to talk again by implying at least that they had more information. So how do you respond to that? Why is that wrong? Pardon me, Your Honor. The district court did seem to imply that, well, the district court didn't imply, the district court straight out said that it was a pretext, but the agent was very clear from the outset he wanted to talk to the defendant and he only wanted to do it and he wanted to talk about some options and he only wanted to do it if it was completely voluntary and let the defendant know again and again only if he was willing to do it and it was up to him. But there was no doubt that the agents wanted to talk to him. They didn't need a pretext. And we don't think there was a pretext in this case. Counsel, I'm not sure the case law is very clear on this point, and I'm not sure it's even relevant here. But is the reason why the government wants to talk to the defendant, is the importance to the government, is that a relevant factor in analyzing the law under Michigan v. Mosley? That is, if it is a very inconsequential issue, it's one thing, but if it is a much more consequential issue, whichever way it cuts, it's something else? Or is that just irrelevant in the government's view? Your Honor, from the government's view, it goes to the totality of circumstances, and it's something the court should consider when weighing the factors because one of the factors is the agents going back to talk about the same subject. Well, here the same subject is this ongoing disappearance of someone. So in evaluating the weight of that factor, certainly it can't outweigh a defendant's Fifth Amendment rights, but in thinking about that factor, it supports going back and talking to someone on the same subject, because they're not going back to say, we have a completed bank robbery and we think you did it. It was, we are trying to locate this woman, and we think you're the person that has the best information. So I do think it fits into the Mosley factor. Sotomayor What is the relevance of that? I mean, in fact, they were, they made these stories up not to, because they wanted him to, they were convinced that he had something to do with her disappearance and they wanted him to say what he'd done. So what's the relevance of the fact that they, that she, they didn't know where she was? The relevance of the fact is that they needed to talk to someone who had some idea of where she was. But they didn't need to lie to him and tell the stories. They did not, Your Honor, I agree. They did not have to lie. That was a tactic. That is an acceptable police tactic. I understand that, but it's an acceptable police tactic. Essentially, we tried to get a confession, and that's what they were really trying to do. So I don't understand the relevance of the fact that they didn't know where she was. Well, I would respectfully disagree that they're only, that they were trying to get a confession. What they were trying to do is to establish, get from the defendant who had the best information, where they could try to locate either the victim or her body to find out what happened. So it's not, it could be that in telling that, the defendant incriminated himself. However, he could have said a variety of other things. He could have said my brother did it. If you're trying to talk to someone who you don't think had some criminal culpability, you wouldn't make up stories like that. It's possible, Your Honor. Did you want to reserve the remainder of your time, Counsel? Yes, I would, Your Honor. Thank you. Good morning, Your Honors. May it please the Court. My name is Assistant Federal Public Defender Keith Hilsendugger. I represent the defendant in this case, Preston Tolf. I want to talk for a second about this belief that we all share who have experienced criminal cases about the fact that the police are allowed to lie to a suspect. I tried to figure out what the source of that rule is, and it appears to be related to challenges where the defendant says, the cops lied to me, and so my subsequent confession was involuntary. That's not the question here. The question here is whether or not Agent Roundy scrupulously honored Mr. Preston's prior invocation of his right to silence. And the passage of time can't be just isolated in a vacuum. It has to be evaluated against what the FBI was doing during that time, right? So Mr. Tolf was initially jailed at a different location than the location where Agent Roundy interviewed him. And he was interviewed at that first location by a different agent, Agent Arrington. And Agent Arrington said, I asked Agent Roundy to interview him because his office is closer to where Mr. Tolf was being held on this State probation violation. So they had to have talked to each other about what Agent Arrington wanted Agent Roundy to get Mr. Tolf to say. It's not just that Agent Arrington would have said, hey, go talk to this guy.  Although I also was curious about where this rule came from, that it's okay to lie to people, although it bothers me. And it's definitely the rule. During so if are you. If I may be honored quickly. It's the rule that says the statements are nevertheless voluntary. I understand. It has nothing to do with the scrupulously honored part. I understand that. But this was all, the lies, the specific lies were all after he had already signed the Miranda waiver. Well, but let's talk about what the circumstances under signing the waiver, too, because that's a little, that's a little less. But can you answer Judge Berzon's question and then go on? Do you agree that the lies were all, the actual lies were all post waiver? He did utter the lies to Mr. Tolf after Mr. Tolf signed the form. But in order to get Mr. Tolf to sign the form, what he did is he shows up and he says, hey, I want to talk to you again. And Mr. Tolf says, you know, that didn't go so well last time. And Agent Rowdy says, I know, but I'm going to present you with a couple of options. And Mr. Tolf says, like the district court focused on, well, I'll listen to what you have to say. And then in order to be able to listen to what Agent Rowdy had to say, Agent Rowdy said, well, you've got to fill in this form first. And he just starts filling in the form. And then at some point after he's filled in most of the form, he hands it to Mr. Tolf, who then signs it. Oh, but he gives him the warnings. He says several times, and you can stop it at any time, and so on. But he presents the form to him as this is not only, not only an opportunity for you to make statements to me, it's for me to make statements to you. Yeah, but as Judge Breslin said, I mean, I'm looking at 2 ER 195. These are the rights you have. We call them the advisive rights, but basically you don't have to talk to me. And then he reads your client, his rights, and your client's signs. Right. But before Agent Rowdy showed up, he had planned to tell Mr. Tolf these extra lives, these more important lives. Why is that relevant if Mr. Tolf didn't know about any lives before he signed? Because the question is whether Agent Rowdy scrupulously honored Mr. Tolf's prior invocation of his right to silence, and lying is the antithesis of scrupulous behavior. Planning to lie to someone is the antithesis of scrupulous behavior. Could you say that?  Mr. Tolf saying, I'll listen to what you have to say, was his consent to talking to them? Has he ever said he didn't understand what was meant by, then they hand him the consent form? The district court found that Mr. Tolf saying, I'll listen to what you have to say, was not the same as, I want to talk to you, I will talk to you. It was, according to the district court, Agent Rowdy's unilateral assumption that those two things were equivalent. And Agent Rowdy proceeded on that basis. Well, but, I mean, he signed, he gave him the rights, he handed him the form, and he signed it. He gave him the rights, he handed him the form, and he signed it. And the form, it doesn't just say you read me your rights. It says I have agreeing to work, to talk. Yes, it does. But it was presented to him in the context of, you have to sign this form also to be able to listen to what I have to say. And that, at the very least, undermines his prior invocation of his right to silence, which is the real question here. I mean, the reason, where I have a hard time is that, I understand you're saying it's a different question, but once the interview has begun, it's hard for me to tell why it is a different question. And so, if this turns out to impugn the Miranda rights, why wouldn't it impugn the Miranda rights in the first interview as well? In other words, if this was a second interview, but if it was a first interview, and the same sequence occurred, you would presumably say the same thing. That is, if they lied to him during the interview, not before it, that it would impugn the validity of the Miranda rights. And I don't think that's ever been the law. I would make the same characterization of what Agent Arrington did in the first interview. That's right. If the issue here were whether to suppress. Is there any case law? Is any of the case law in which there has been lying during an interview, presumably after Miranda rights, ever impugned the validity of the Miranda waiver? The waiver, yes. The previous invocation, no. I cannot find, I did not find. But I'm saying forget the previous invocation. Suppose this was the first interview. There was no previous invocation. This was the first interview. There was a Miranda warning. It was, there was a signature. There was a, a, and then they start doing these lies. I mean, I find them extremely distressing, but that's the law. Wouldn't your argument say that in all of those instances, the Miranda warning was voided? Your Honor, now I understand what you're getting at. And I have to back up over something I just said where I would be making the same argument with respect to Agent Arrington as I would be with respect to Agent Roundy. Your Honor, I agree. If this were the first interview, there would, there would necessarily have been no prior invocation of his Miranda rights. And so the only question would be whether the waiver was valid. There's plenty of case law talking about the validity of waivers. And just because the police lied to someone in order to get them to waive their Miranda rights. So it's not only a question of the voluntariness of the confession. It's a question of the voluntariness of the Miranda warning. It's a question. Of the Miranda waiver. At the first interview, yes. Right. The difference here is this is. So that becomes extremely fine cut at that point. Wow. Because it's, if in fact it doesn't void the Miranda warning, why would it void it the second time around just by itself? Because, because you don't look at these three interviews in a vacuum. The second interview takes place against the backdrop of the fact that Agent Roundy knew that Agent, that Mr. Tolff had ended his interview with, with Agent Arrington by saying I don't want to talk to you. Agent Roundy approached Mr. Tolff knowing that there had been a prior invocation. And the case law is clear. You look at whether the invocation is scrupulously honored. Because that means the defendant has expressed his desire to deal with the police in a certain way. And thereby accommodate the inherently coercive nature of custodial interrogation by, in this case, invoking his right to silence. I don't want to talk to you. I just lost my train of thought and then I see the yellow light is on. So if there are no more questions, I'll ask the Court to affirm, please. Thank you, counsel. You have a little bit of time left. I'll talk fast. Thank you, Your Honors. I know that counsel said that lying is the antithesis of scrupulously honoring. However, in Michigan v. Mosley, that's not what the Supreme Court found. The Supreme Court found that the defendant's rights were scrupulously honored after an agent lied to him about his involvement and what evidence they had against him. And I would say respectfully that counsel got the chronology wrong here. When Agent Roundy was talking to the defendant at the second interview, he first advised him of his Miranda warnings and asked the defendant, do you understand? And the defendant said, yes, I do. And then the conversation continues where it went to, do you want to talk to me? I don't know. Last time it didn't go so well. Then there was more discussion about this has to be completely up to you. This has to be completely voluntary. And then he said, I'll listen. And I'll listen is certainly not a clear invocation of the right to silence. It's saying exactly that. I'll listen to what the agent had to say. And Tolf did that. And then he began to engage as the interview progressed. And in terms of what was going on during the six days in between the first interview and the second. Why don't you conclude, counsel, please. Thank you, Your Honor. Your Honor, because the Mosley factors weigh in favor of finding that the defendant's rights were scrupulously honored during the second and third interviews, I'd ask the Court to reverse. All right. We thank counsel for their arguments. The case just argued is submitted. We will now take a short recess. Thank you.
judges: BERZON, BENNETT, Lefkow